IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | ) Cause No. CR-10-41-BLG-RFC |
| Plaintiff, | ) |
| v. | ) **ORDER DENYING** |
| | ) **MOTION TO SUPPRESS** |
| **GEOFREDO JAMES LITTLE BIRD, JR.**, | ) |
| Defendant. | ) |

## I.   INTRODUCTION

Defendant is charged in a three-count Indictment with conspiracy to distribute more than 500 grams of methamphetamine and two underlying methamphetamine crimes. *Doc. 1*. Presently before the Court is Defendant's motion to suppress. *Doc. 15*. Although Defendant initially challenged the legality of the traffic stop that resulted in his arrest and the seizure of methamphetamine and cash, the Government has conceded the illegality of the stop and will not seek admission of any evidence or statements acquired during the stop, search, and arrest. Accordingly, the only remaining issue for this motion is whether the statements Defendant made two days

1

later while incarcerated are sufficiently attenuated from the taint of the illegal traffic stop to allow for their use as evidence. After listening to the testimony during the September 14, 2010 evidentiary hearing, the Court is convinced the statements made to investigators on May 5, 2009 were sufficiently attenuated from the illegality of the May 3, 2009 traffic stop. Defendant's motion must therefore be denied.

## II.    FACTUAL BACKGROUND

In the evening hours of May 3, 2009, Big Horn County Deputy Sheriff Harold Brien was driving to work on Sarpy Road, in Big Horn County, Montana. At the same time, Defendant was a passenger in a white Windstar van driving on Sarpy Road. When Deputy Brien saw the van drive toward an area he knew was used for "drinking beer and doing and dealing dope," he conducted a traffic stop. A search revealed methamphetamine and cash. Deputy Brien called BIA Agent Clayvin Herrera and another officer to assist in the investigation, which resulted in Defendant's arrest on tribal charges. Herrera did not speak with Defendant again until the May 5, 2009 interview.

On May 4, 2009, Defendant was arraigned in tribal court and Leslie Plainfeather, of Montana Legal Services, was appointed as his tribal advocate. At some time between the arraignment and the interview, Defendant retained Steve Yapuncich to represent him as he had done in prior matters.

On May 5, 2009 at approximately 3:00 p.m., nearly two days after his arrest, Defendant was interviewed by Officer Herrera and BIA Special Agent Tony Larvie, who Herrera had asked to assist in the interview. After speaking with Yapuncich, who was present during the interview, and waiving his *Miranda* rights, Defendant implicated himself in a conspiracy to distribute methamphetamine. The central factual issue to be resolved by the evidentiary hearing was whether Defendant himself asked to speak to investigators.

Specifically, Herrera testified that while he did not remember who contacted him or how he was contacted, he is certain that he did not contact the Defendant or Yapuncich to arrange the interview. Further, although it is not Herrera's practice to contact defendants or their advocates, if he had sought an interview he would have done so through Leslie Plainfeather, Defendant's advocate of record. It is Herrera's belief that Yapuncich called him about the interview, but it is also possible that Defendant enlisted jail personnel to make the call. Regardless, Herrera believes that whoever contacted him told him to contact Yapuncich. Finally, Herrera testified that he is familiar with Yapuncich and that it is not uncommon for Yapuncich to contact law enforcement when the defendants he represents wish to speak with them.

BIA Special Agent and designated drug investigator Tony Larvie testified next. Larvie was contacted by Herrera on the day of the interview and told that Defendant wanted to speak to law enforcement. Larvie had heard about the Defendant's arrest and the seizure of the methamphetamine, but had not contacted Defendant for an interview. Nor had Defendant or Yapuncich contacted him. When asked why his report did not include the fact that Defendant had volunteered to be interviewed, Larvie testified he didn't know this information would be important.

The Government's final witness was FBI Special Agent Ernie Weyand. Weyand testified that over the three years he has worked the Crow and Northern Cheyenne Indian reservations, he has periodically interacted with Yapuncich acting as a lay advocate for defendants in tribal court. According to Agent Weyand's experience, Yapuncich commonly contacts law enforcement officers about interviewing his clients if Yapuncich believes it will benefit the client.

The only defense witness was Yapuncich. Yapuncich testified that he had previously represented the Defendant in tribal court matters, but that he did not contact law enforcement to initiate the interview and law enforcement did not contact him. Yapuncich had no knowledge as to whether the Defendant himself contacted law enforcement about an interview. Yapuncich believed he became

involved in this case when he received a call from a jailer who said the Defendant wanted him to come to the jail to be present during an interview. Yapuncich went to the jail immediately and was allowed to meet with the Defendant alone, in a private room, with no time limit, prior to the interview. He was also present during the interview.

### III.  ANALYSIS

The exclusionary rule does not bar the admission of statements obtained because of an unlawful arrest if the statement is voluntary under the Fifth Amendment and is "sufficiently an act of free will to purge the primary taint." *Wong Sun v. United States*, 371 U.S. 471, 486 (1963). Although the Court need not decide it here because Defendant concedes his statement meets the Fifth Amendment standard for voluntariness, *Doc. 19, p. 4,* the voluntariness of the statement is a threshold requirement. *Brown v. Illinois,* 422 U.S. 590, 604 (1975).

In *Brown,* the Supreme Court reiterated that the issue is whether the statement was obtained by exploitation of the illegality of the arrest and announced three factors for courts to consider in determining whether there is sufficient attenuation between the Fourth Amendment violation and the subsequent statement: (1) the temporal proximity of the arrest and the confession, (2) the presence of intervening circumstances, and, (3) the purpose and flagrancy of the official

misconduct. 422 U.S. 590, 600, 603-04 (1975). The Government bears the burden of proving the statement is admissible. *Brown,* 422 U.S. at 604.

First, almost two days passed from the time of the illegal search until Defendant was interviewed at the jail. Since there is no bright line rule as to the amount of time required to attenuate the taint of an illegal arrest, *see e.g.*, *United States v. Shi*, 525 F.3d 709, 727 (9th Cir. 2007) (confession was admissible where one day had passed) and *United States v. Freeman,* 2009 WL 2046039, *3 (D.Or. 2009) (statements inadmissible despite nineteen months since the Fourth Amendment violation), this factor must be considered in light of the other factors.

Second, although the traffic stop was a flagrant violation of Defendant's Fourth Amendment rights, the officer that conducted the traffic stop did not know who was in the van and he was not at all involved with the subsequent interview or investigation. There is no evidence that the traffic stop was used as a device to elicit a confession.

Most importantly, there are significant intervening circumstances. Not only did Defendant sign a *Miranda* waiver after being fully advised of his rights with his tribal advocate present, but the suppression hearing testimony established that it is more likely than not that Defendant himself asked to be interviewed.

Specifically, if the interview was not Defendant's idea or not in the Defendant's best interests, the Court assumes Yapuncich would have put a stop to it after their pre-interview meeting. It is undisputed that Defendant summoned Yapuncich so that he would be present during the interview, that Yapuncich had unrestricted opportunity to meet with Defendant prior to the interview, that Yapuncich encourages his clients to speak with law enforcement when he believes it will benefit them, and that Yapuncich was present when Defendant incriminated himself.

Further, both Herrera and Larvie testified credibly that they did not arrange the interview. Agent Herrera testified that he believed he was contacted by Yapuncich, but that it could have been the Defendant who contacted him through jail personnel. Agent Larvie confirmed that Defendant or Yapuncich instigated the interview with his testimony that when he was first contacted about the case by Agent Herrera, Herrera told him that Defendant wanted to speak with them. Although three law enforcement officers testified that Yapuncich commonly calls law enforcement to offer his client for an interview if he believes it will benefit his client, Yapuncich testified that he did not arrange this interview. Since there is no reason to doubt Yapuncich's testimony, the most likely scenario is that Defendant contacted Agent Herrera through jail personnel.

In the Court's view, the fact that Defendant himself requested the interview is an intervening circumstance sufficient to attenuate the taint of the Fourth Amendment violation. This conclusion is further strengthened by the Defendant's concession that his statements were voluntary, the two-day period between the arrest and the statement, and the fact that the officer who conducted the traffic stop was not at all involved in the May 5, 2009 or the subsequent investigation.

For those reasons, **IT IS HEREBY ORDERED** that Defendant's motion to suppress (*Doc. 15*) is **DENIED.**

Dated this 15th day of September, 2010.

_/s/ Richard F. Cebull_____
Richard F. Cebull
United States District Judge